1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

PAUL ASCHERL,

     Plaintiff,

vs.

CITY OF ISSAQUAH,

     Defendants.

Case No. 2:11-cv-01298

**PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

**NOTE ON MOTION CALENDAR:**
[date:_____]

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

Plaintiff Paul Ascherl ("Ascherl"), pursuant to Fed. R. Civ. P. 65(a), respectfully moves this Court for a preliminary injunction enjoining Defendants and their agents, servants, employees, attorneys, and all persons and entities in active concert or participation with them, directly or indirectly, from applying Issaquah City Code § 5.40.040, on its face and as applied, so as to prevent Ascherl and other third party speakers from engaging in peaceful literature distribution on public sidewalks in downtown Issaquah during the 2011 Salmon Days Festival and during all subsequent Salmon Days Festivals.

## STATEMENT OF FACTS

Ascherl is a Christian who shares his religious beliefs with others in public. (Verified Complaint, ¶ 12). To accomplish this goal, Ascherl visits public ways and distributes literature about his faith. (Affidavit of Paul Ascherl, ¶ 3, filed as Exhibit "A" concurrently with Motion for Preliminary Injunction). This medium is an inexpensive and uniquely effective method for conveying information. (Ex. "A," ¶¶ 4-6).

While sharing his message, Ascherl does not engage in any type of demonstration, seek to draw a crowd, ask for money, or try to gather signatures. (Ex. "A," ¶ 7). He does not force his literature on anyone or create congestion. (Ex. "A," ¶¶ 9-10). Ascherl typically remains stationary and asks passersby if they would like a Gospel tract. (Ex. "A," ¶ 11).

Ascherl desires in particular to distribute literature while standing on the public ways of downtown Issaquah during the Salmon Days Festival. (Ex. "A," ¶ 12). The Salmon Days Festival is an annual festival that occurs on the first full weekend of October and celebrates the return of salmon to the lakes, streams and hatcheries in Issaquah. (Compl., ¶ 23). The Festival is presented by the Greater Issaquah Chamber of Commerce with support from the City of Issaquah

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-1
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

and the Issaquah Arts Commission. (Compl., ¶ 23).

For the Salmon Days Festival, Issaquah has promulgated rules and regulations, appearing in Chapter 5.40 of the Issaquah Code of Ordinances. (Compl., ¶ 25; true and correct Copy of Chapter 5.40 of the Issaquah Code of Ordinances is being filed concurrently with this Motion as Exhibit "B.") Pursuant to this ordinance, the Salmon Days Festival is to occur in a significant portion of downtown Issaquah, encompassing the areas where East Sunset Way intersects Front Street, Veterans Memorial Park, the Issaquah Hatchery, and other adjacent areas. (Compl., ¶ 26; true and correct copy of a map for the 2011 Salmon Days Festival is being filed as Exhibit "C," also available at the website for the Salmon Days Festival. (http://www.salmondays.org/design_images/maps/FESTIVAL-MAP-2010-LG.jpg).) These areas remain free and open to the general public, allowing pedestrians to enter at various points. (Ex. "A," ¶ 13; Compl., ¶ 26). There are no specific points of entry into the Salmon Days Festival. (Compl., ¶ 26).

The Salmon Days Festival hosts various activities and events. (Compl., ¶ 27). Festival attendees can enjoy exhibits, booths, a parade, a "Foods of the World" exhibition, 5K and 10K runs, live entertainment, and a "Field of Fun event" where children ride ponies, jump on trampolines, and play on inflatables. (Compl., ¶ 27). The Festival booths are available to food vendors, arts and crafts vendors, and non-profit organizations, but anyone renting a booth must pay an application fee, a rental fee, and provide proof of insurance. (Compl., ¶ 28; a true and correct copy of the application and rules to obtain a booth for the 2011 Salmon Days Festival is being filed as Exhibit "D." These rules are also available at the website for the Salmon Days Festival. (http://www.salmondays.org/index.php)). The only non-profit organizations eligible for

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-2
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

a booth are those "located in Issaquah and/or are significant providers to the Issaquah community." (Compl., ¶ 29).

During Salmon Days Festival, parts of East Sunset Way and Front Street are closed to vehicular traffic, while remaining open to pedestrian traffic, permitting pedestrians free access to these streets and adjoining sidewalks. (Ex. "A," ¶ 14). East Sunset Way and Front Street maintain their function as public thoroughfares and part of the city's transportation grid. (Ex. "A," ¶ 14). Citizens continue to use these public ways during Salmon Days Festival to reach various parts of the city, including a variety of businesses. (Ex. "A," ¶ 14).

On Saturday, October 2, 2010, Ascherl and two friends went to downtown Issaquah to express their Christian beliefs via literature distribution and dialogue. (Ex. "A," ¶ 15). Ascherl chose this place and time because he wanted to reach the large audience attending the Festival. (Ex. "A," ¶ 16). At no point did Ascherl attempt to participate in or disturb Festival activities. (Ex. "A," ¶¶ 17-19).

When Ascherl arrived downtown, he began walking on Front Street, near where Front Street intersected NE Dogwood St., as he distributed literature and dialogued. (Ex. "A," ¶ 20). Ascherl observed many other people walking around and standing in the same area as they ate food, watched festival activities, talked to each other, and waited in line. (Ex. "A," ¶ 21).

Ascherl engaged in his expressive activity for approximately five minutes when a female Festival official approached him and ordered him to stop distributing literature. (Ex. "A," ¶ 22). Ascherl declined and the official left to go get the police. (Ex. "A," ¶ 22). Ascherl continued to distribute literature for about 30 more minutes until two police officers with the Issaquah Police Department approached him. (Ex. "A," ¶¶ 23-24). The officers inquired about his literature and

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-3
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

wanted to make sure he was not harassing anyone.  (Ex. "A," ¶ 25). After Ascherl assured them of his peaceful activities, the police permitted him to continue with his literature distribution. (Ex. "A," ¶ 25).

A few minutes later, though, the police approached Ascherl again, accompanied by the same female festival organizer that spoke with Ascherl before. (Ex. "A," ¶ 26). This time the officers ordered Ascherl to stop distributing literature. (Ex. "A," ¶ 26). Ascherl asserted his right to distribute literature on a public sidewalk. (Ex. "A," ¶ 26). Ascherl also asked about the existence of any law prohibiting his literature distribution. (Ex. "A," ¶ 26). The police officers left, but soon returned, and showed Ascherl a copy of Issaquah City Code § 5.40.040. (Ex. "A," ¶ 28). According to the officers, this ordinance prohibited all literature distribution except in two specific "free speech zones." (Ex. "A," ¶ 29). The police officers also advised Ascherl that he would be guilty of a misdemeanor and subject to arrest if he continued to distribute literature outside of these zones. (Ex. "A," ¶ 29).

Though Ascherl wanted to continue to distribute literature in his chosen location, he did not want to be arrested; so he went to one of the designated free speech zones. (Ex. "A," ¶ 30). The first free speech zone was located near the intersection of Front St. and Sunset Way, very close to the Front St. Stage where various musicians were playing. (Ex. "A," ¶ 31).  Hardly anyone was in or near the area because it was so out of the way, and Ascherl could not converse with anyone because it was so loud. (Ex. "A," ¶¶ 31-32). Unable to convey his message at the first speech zone, Ascherl left for the second speech zone. (Ex. "A," ¶ 32).

The second free speech zone was located on West Sunset Way on a bridge near the Issaquah Hatchery and the intersection of West Sunset Way and Newport Way. (Ex. "A," ¶ 33).

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-4
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

Like the first speech zone, few people came near this area. (Ex. "A," ¶ 34). Since people can enter the Festival from almost any location, Ascherl missed 99% of the people attending the Festival. (Ex. "A," ¶ 34). After trying to distribute literature in both of the so-called free speech zones, Ascherl realized that neither space offered a suitable place for his expression. (Ex. "A," ¶ 35). Ascherl thus discontinued his activities and left the Salmon Days Festival. (Ex. "A," ¶ 35).

The ordinance used to silence Ascherl, § 5.40.040 of the Issaquah City Code, is entitled "Designated areas for leafleting, entertaining, and nonprofit distribution" (hereinafter "anti-leafleting ordinance") and reads:

**5.40.040 Designated areas for leafleting, entertaining, and nonprofit distribution.**

A. The City of Issaquah hereby establishes designated "expression areas" within the festival area for leafleting, organized protesting, nonscheduled entertainment, and nonprofit distribution. These designated expression areas shall be located by the Festival Events Division of the Greater Issaquah Chamber of Commerce in such a way as to minimize interference with the orderly flow of pedestrian traffic through the festival area while still providing an area for members of the public to freely express themselves. The locations of the designated expression areas shall be subject to approval by the City Council prior to Salmon Days.

B. The Festival Events Division of the Greater Issaquah Chamber of Commerce shall ensure that adequate trash receptacles are located in these designated areas.

C. The designated expression areas shall be marked by at least one sign containing the words "expression area" so that police officers and Salmon Days volunteers are able to direct persons wishing to partake of these activities to that area.

D. No person shall erect a table, easel, soapbox, stand, or similar structure which could interfere with pedestrian traffic within the festival area, including the designated expression areas, without the written permission of the Festival Events Division of the Greater Issaquah Chamber of Commerce.

E. No leafleting, organized protesting, non-scheduled entertainment, or nonprofit distribution shall be allowed outside of a booth or the above-established, designated expression areas.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-5
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

F. Violation of this section shall constitute a misdemeanor. Before enforcing this section, police officers shall give a verbal warning informing the violator of this chapter and of the location of the designated expression areas where such activities are allowed. If the violator continues the activity after this warning the police may arrest the violator.

G. Nothing in this section should be read to prevent attendees from expressing themselves through purely oral communication at any location within the festival area. Nothing in this section should be read to prevent attendees from carrying signs at any location within the festival area so long as the sign conforms with IMC 5.40.050.

This anti-leafleting ordinance deters Ascherl's expression because it bars literature distribution during Salmon Days Festival outside of two remote areas and also because it prohibits anyone from standing on boxes in the free speech zone in order to attract people. (Ex. "A," ¶¶ 37-38). These requirements impose intolerable burdens on Ascherl's expression, keeping him from effectively distributing literature to his intended audience. (Ex. "A," ¶ 35). For fear of arrest, Ascherl cannot return to public ways of downtown Issaquah during the Salmon Days Festival and distribute literature in areas where he can reach a meaningful audience. (Ex. "A," ¶ 38). If not for the anti-leafleting ordinance, and the actions of Defendants in enforcing this ordinance, Ascherl would return to the 2011 Salmon Days Festival and subsequent festivals to share his message via literature distribution and conversation. (Ex. "A," ¶ 38).

## ARGUMENT

A request for a preliminary injunction relates to four factors: (I) the likelihood of Plaintiff's success on the merits; (II) the likelihood of irreparable harm to the Plaintiff in the absence of relief; (III) the balance between the harm to the Plaintiff and the harm that the relief would cause to the other litigants; and (IV) the public interest. *Stormans, Inc. v. Selecky*, 571 F.3d 960, 977-78 (9th Cir. 2009). These factors favor Ascherl receiving his requested injunctive

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-6
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

relief.

## I.     ASCHERL IS LIKELY TO SUCCEED ON MERITS

Forum analysis is used to evaluate regulations impacting free expression on public property. This process entails three inquiries: A) the extent to which expressive activity is protected, B) the nature of the forum, and C) the appropriate level of scrutiny to be applied. *Currier v. Potter*, 379 F.3d 716, 734-35 (9th Cir. 2004).

### A.  Ascherl 's Expression Deserves First Amendment Protection

Ascherl wants to share his religiously-held beliefs through literature and conversation. (Ex. A, ¶¶ 2-12). These innocuous methods constitute speech protected under the First Amendment. *See, e.g., Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (noting that oral and written dissemination of religious viewpoint are protected speech); *Murdock v. Pennsylvania,* 319 U.S. 105, 108 (1943) (explaining that the hand distribution of religious tracts "has the same claim as the others to the guarantees of freedom of speech and freedom of the press…").

### B.  Sidewalks in Downtown  Issaquah are Traditional Public Fora

The propriety of restrictions imposed on protected speech turns on the character of the property where the speech takes place. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (citation omitted). The Ninth Circuit recognizes three general types of property for speech purposes: traditional, designated, and nonpublic fora. *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007). Traditional public fora are places that, by long tradition, have been devoted to assembly and debate. *Id.* Designated public fora are areas that the government has intentionally dedicated to expressive activity. *Id.* Nonpublic fora are areas that have not by tradition or designation been

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-7
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

opened to expressive activity. *Id.*

Ascherl would like to express his beliefs on the public ways in downtown Issaquah. (Ex. A, ¶ 12). These public ways --- sidewalks and streets --- constitute "prototypical" examples of traditional public fora. *Schenck v. Pro Choice Network of Western New York*, 519 U.S. 357, 358 (1997). To be sure, "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). *See also Hill v. Colorado*, 530 U.S. 703, 715 (2000) (noting that "Public sidewalks, streets, and ways…are 'quintessential' public forums for free speech."); *ACLU of Nevada v. City of Las Vegas*, 333 F. 3d 1092, 1099 (9th Cir. 2003) ("The quintessential traditional public forums are sidewalks, streets, and parks."); *Acorn v. City of Phoenix*, 798 F.2d 1260, 1266 (9th Cir. 1986) (noting that the Supreme Court has "listed 'sidewalks' separately as an additional example of traditional public fora…"). For this reason, no "particularized" inquiry is required for these areas. *Frisby*, 487 U.S. at 481.

Issaquah is not at liberty to change the status of these public ways. Traditional public fora "are open for expressive activity regardless of the government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). Traditional public fora cannot be transformed into non-public fora by government whim. "Congress, no more than a suburban township, may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums…" *United States Postal Service v. Council of Greenberg Civic Ass'n.*, 453 U. S. 114, 133 (1981). *See also United States v. Grace*, 461 U.S. 171, 175 (1983) (government may not "transform the character of the property by the

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-8
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property."); *ACLU of Nevada*, 333 F. 3d at 1103-05 (ruling that sidewalk in downtown Las Vegas was still a traditional public forum regardless of city's intent and unique features of sidewalk). Because the public ways in question remain free and open to the public during Salmon Days Festival (Ex. A, ¶¶ 13-14), these public ways remain traditional public fora during the entirety of this event.

The Ninth Circuit drew a similar conclusion in *Gathright v. City of Portland*. 439 F.3d 573, 575 (9th Cir. 2006). In *Gathright*, Portland gave permits to private parties to conduct particular events in a public park and in a town square and allowed these private parties to remove speakers from these areas. *Id*. In evaluating this issue, the Ninth Circuit applied the time, place, manner standard against Portland's permit scheme --- the standard only appropriate for regulations on expression in a traditional public forum. *Id*. at 578.

With this analysis, the Ninth Circuit is far from an outlier. Every single circuit to consider the issue has concluded that public streets and parks remain traditional public fora during festivals that are free and open to the public. *See, e.g., Startzell v. City of Philadelphia*, 533 F.3d 183, 197 (3d Cir. 2008) ("Furthermore, like the Arts Festival in Parks, OutFest took place in the streets and sidewalks of Philadelphia, an undisputed quintessential public forum. The issuance of a permit to use this public forum does not transform its status as a public forum."); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 879 (9th Cir. 2008) (explaining that "Plaintiff's activities occurred in a traditional public forum" even though activities occurred in public square during permitted festival); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (explaining "that one's constitutionally protected rights disappear because a private party is hosting an event

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-9
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

that remained free and open to the public. Here, Parks attempted to exercise his First Amendment free speech rights at an arts festival open to all that was held on the streets of downtown Columbus. Under these circumstances, the streets remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council.").

Government entities cannot alter the status of public streets and parks via permitting process. The sidewalks and public ways in downtown Issaquah remain traditional public fora throughout the Salmon Days Festival.

### C. Anti-Leafleting Ordinance is Overbroad and Not Narrowly Tailored to Any Significant Government Interest

The classification of downtown sidewalks and ways as traditional public fora is significant because "[i]n such fora, the government's right 'to limit expressive activity [is] sharply circumscribed.'" *Berger v. City of Seattle,* 569 F.3d 1029, 1036 (9th Cir. 2009) (*en banc*). To be valid, a regulation on expression in a traditional public forum must be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication. *Id.* Issaquah's anti-leafleting ordinance, in banning all leafleting in all public areas of downtown Issaquah except for two isolated zones, does not serve any significant interest in a narrowly tailored way.[1]

---

[1] Just as Issaquah's anti-leafleting ordinance lacks narrow tailoring, it is also facially overbroad. The overbreadth doctrine allows a plaintiff to challenge a law "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997) (citation omitted). Because arguments showing overbreadth and narrow tailoring are so similar, courts routinely treat these arguments together. *See, e.g.*, *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 606 n.3 (6th Cir. 2005) (noting that reasoning about lack of tailoring led to same conclusion on overbreadth grounds); *Boardley v. U.S. Dep't of Interior*, 605 F.Supp.2d 8, 19 (D.D.C. 2009) ("Courts have recognized that a

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

Under the narrow tailoring requirement, regulations cannot "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). A restriction is "narrowly tailored" only if it eliminates no more evil than it seeks to remedy. *Frisby*, 487 U.S. at 485. And, abstract goals are not enough. "[T]he First Amendment demands that municipalities provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest…" *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001) (citation omitted). The availability of less burdensome alternatives indicates a lack of appropriate tailoring. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1041 (9th Cir. 2006). With this benchmark in mind, Issaquah's anti-leafleting ordinance fails because it unduly bans all literature distribution in a traditional public forum (public sidewalks and ways).

Issaquah's anti-leafleting ordinance demonstrates a disconnect between its purported purpose and its impact on expression. Any purported concerns about security, litter, or congestion cannot justify Issaquah's broad restriction on speech. *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004) ("merely invoking interests ... is insufficient. The government must also show that the proposed communicative activity endangers those interests."). There is nothing inherent about the act of literature distribution that would invoke security, litter, or congestion concerns. Issaquah permits a plethora of activities to occur in the Festival area --- waiting in line, standing around and conversing, eating --- that cause just as much – if not more

---

substantial overbreadth claim is similar, if not identical, to a claim that a prior restraint is not narrowly tailored."). For these reasons, Ascherl can appropriately consolidate these arguments, for by showing Issaquah's anti-leafleting ordinance to lack tailoring, he also shows the ordinance to be overbroad.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-11
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

– congestion, litter, and safety problems. (Ex. A, ¶ 21). *See Lederman v. United States,* 291 F.3d 36, 45 (D.C. Cir. 2002) ("Some banned activities, however, cannot possibly pose that risk [of traffic control and safety]. For example, a single leafleteer standing on the East Front sidewalk will no more likely block traffic or threaten security than will photographers, star-struck tourists, and landscape painters complete with easels, but the Board has made no effort to keep any of these latter individuals away from the Capitol.").

In *Berger v. City of Seattle*, the City of Seattle imposed a variety of requirements on individual street performers in one of its crowded public parks. 569 F.3d 1029, 1035 (9th Cir. 2009). Seattle defended its permit requirement as necessary to further "its interest in protecting the safety and convenience of park-goers by reducing territorial disputes among performers, deterring harassment of audience members, and 'clarifying and coordinating potentially competing uses.'" *Id*. at 1041. In other words, Seattle tried to justify its regulation as a means to enhance security in the crowded park, but the Ninth Circuit rejected this rationale:

> The permitting requirement is, according to the City, designed in part to reduce obstreperous conduct by street performers. Yet, by the City's own account, most street performers are not problematic. So the permitting requirement burdens all performers to root out the occasional bad apple. By doing so, it fails to "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy."

*Id*. at 1045-46 (citation omitted). *See also Boardley v. U.S. Dept. of Interior*, 615 F.3d 508, 522 (D.C. Cir. 2010) ("But why are individuals and members of small groups who speak their minds more likely to cause overcrowding, damage park property, harm visitors, or interfere with park programs than people who prefer to keep quiet? We fail to see why an individual's desire to be communicative is a strong proxy for the likelihood that she will pose a threat to park security or accessibility. No doubt some individuals and small groups will cause these problems, but many

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-12
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

will not; and the government has not explained why those engaged in free expression are more likely to be problematic than anyone else.") (citations omitted).

Likewise, there is no question that most people distributing literature at Salmon Days Festival (like Ascherl) do not generate any real concern. (Ex. A, ¶ 20). Banning all literature distribution to "root out the occasional bad apple," Issaquah's restriction unnecessarily prohibits a vast amount of activity that is harmless, making Issaquah's ban overbroad.

Bans on literature distribution are routinely invalidated because such bans do not necessarily prevent litter, congestion, or safety problems. In *International Soc. for Krishna Consciousness, Inc. v. Lee*, for instance, airport authorities banned solicitation of money and literature distribution in an airport terminal in order to minimize congestion in that confined, highly trafficked area. 505 U.S. 672, 675-76 (1992). After the Supreme Court found the terminal to be a non-public forum, and upheld the ban on soliciting money, *id.* at 680-84, it invalidated the ban on literature distribution. *Id.* at 690-93.[2] In so doing, the Supreme Court distinguished literature distribution from monetary solicitation, explaining that the former does not create any congestion problem since it "does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time." *Id.* at 690 (citation and quotations omitted). Surely, if the congestion/safety/access rationale does not warrant a literature distribution ban in an enclosed and crowded airport terminal --- a non-public forum where regulations need only be reasonable --- then that same rationale cannot warrant a ban on literature distribution in a wide open public park --- a

---

[2] On this point, Justice O'Conner's concurring opinion in *Lee* is the controlling opinion. *See, e.g., Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1316 n.6 (Fed. Cir. 2008).

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-13
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA 98277
Tel. 360-675-9088

traditional public forum where regulations must overcome a much higher standard. *See also Grace,* 461 U.S. at 176 (invalidating ban on literature distribution on sidewalk around Supreme Court because such ban not narrowly tailored to prevent congestion or ensure safety); *Ward*, 491 U.S. at 799 n.7 (explaining that literature distribution does not cause "traffic congestion"); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("[The right to distribute literature] may not be withdrawn even if it creates the minor nuisance for a community of cleaning litter from its streets."); *Schneider v. New Jersey*, 308 U.S. 147, 162 (1939) ("We are of opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it."); *Lederman*, 291 F.3d at 43 ("If people entering and leaving the Capitol can avoid running headlong into tourists, joggers, dogs, and strollers…then we assume they are also capable of circumnavigating the occasional protester.").

A festival setting cannot justify a ban on literature distribution. The Sixth Circuit recently confronted this issue in *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011). There, Dearborn banned literature distribution throughout a street festival, free and open to the public. *Id*. at 729-32. Because of this ban, speakers could not distribute literature on public sidewalks and streets located in the Festival's "inner perimeter," but they could distribute literature from certain booths and tables within the festival. *Id*. Dearborn claimed this ban was necessary to relieve "pedestrian overcrowding," enhance "traffic flow," minimize "threats to public safety," and limit "disorderliness at the Festival." *Id*. at 736. The Sixth Circuit declined to follow this logic because the Festival was still "open for public traffic:"

The sidewalks may well host more traffic during the Festival than they do on other days of the year. Nevertheless, the defendants have chosen to keep the

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

> sidewalks open for public use, showing that the interests in crowd control and public safety are not so pressing that they justify restricting normal activity that occurs on streets and sidewalks. Therefore, because Festival organizers permit public traffic on the sidewalks next to Warren Avenue, the interest in curtailing First Amendment expression on those sidewalks is not substantial.

*Id.* at 737. Just like Dearborn, Issaquah has chosen to keep its Festival open for public use and open to a wide variety of activities that create just as many (if not more) problems than literature distribution. As a result, Issaquah cannot credibly rely on congestion or safety concerns to single out and ban literature distribution only. Ascherl and others should be able to "leaflet from any street or sidewalk that remains open for typical, non-Festival pedestrian traffic, even if the street or sidewalk is simultaneously used for Festival traffic." *Id.* at 741. *See also Teesdale v. City of Chicago*, No. 09 C 4046, 2011 WL 2143027 at *6, 10 (N.D.Ill. May 26, 2011) (enjoining ban on literature distribution on public streets in festival free and open to the public).

Nor does the availability of two "speech zones" for literature distribution negate the adverse impact on speech. Issaquah still bans literature distribution in 99% of the Festival area. The so-called speech zones are not adequate alternatives since they are located in remote areas where hardly anyone travels. (Ex. A, ¶¶ 31-35). *See, e.g., Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("The mere existence of an alternative method of communication cannot be the end of the analysis. We must also give adequate consideration to whether the alternatives are ample. Whether an alternative is ample should be considered from the speaker's point of view."). Allowing expression in two small, isolated "speech zones" pales in comparison to the "anti-speech zones" that cover the rest of downtown Issaquah. [3] Issaquah cannot

---

[3] Consequently, Issaquah's anti-leafleting ordinance also does not leave open alternative avenues of communication. *See, e.g., Edwards*, 262 F.3d at 866 ("[i]f an ordinance effectively prevents a

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

substantiate its ban on literature distribution by pointing to alternative avenues where communication can occur. *See Schneider*, 308 U.S. at 163 ("…one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."); *Saieg*, 641 F.3d at 740 ("Thus, the leafleting restriction is unconstitutional even if it leaves open ample alternative channels of communication."); American-Arab Anti-Discrimination Comm. v. City of Dearborn, 418 F.3d 600, 607 (6th Cir.2005) ("Lastly, the city of Dearborn claims that because it has provided ample alternative means of communication, namely Dearborn City Hall and Dearborn parks, the thirty-day notice period does not pose a substantial burden on free expression. However, whether the thirty-day notice period is narrowly tailored is a separate question, to be taken on its own…providing ample alternative means of communication will not cure a defective regulation if Dearborn's thirty-day notice provision sweeps too broadly."); *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984) ("[L]aws regulating public fora cannot be held constitutional simply because they leave potential speakers alternative fora for communicating their views."). Issaquah must demonstrate that the prohibition on speech is necessary.

In *Gerritsen v. City of Los Angeles,* 994 F.2d 570 (9th Cir. 1993), a city banned literature distribution in certain areas of a public park demarcated by blue lines. *Id*. at 573-74. Because

---

speaker from reaching his intended audience, it fails to leave open ample alternative means of communication."). Indeed, the Ninth Circuit has commonly invalidated regulations for failing to leave open alternative avenues of communication when those regulations confined speakers to impartial "speech zones." *See, e.g.*, *United States v. Baugh*, 187 F.3d 1037, 1044 (9th Cir. 1999) (forcing protestors into free speech zone 150 yards away from those entering visitor center failed to leave open alternative avenues); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (requiring a 75-yard security zone between demonstrators and intended audience did not leave open ample alternative means of communication).

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-16
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

these areas were very crowded and near a consulate building, the city defended the ban as necessary to maintain "a calm, secure environment" and to avoid "congestion in these often crowded areas." *Id.* at 577. The Ninth Circuit invalidated the regulation for infringing on too much harmless expression:

> To the extent that City officials sought to curtail unprotected activity in the blue-line areas (such as disruption of other legitimate park activities, the business of the Mexican Consulate, or visitors' enjoyment of the park), the total ban on handbill distribution is substantially broader than necessary. Moreover, City officials already had in place regulations to prevent these behaviors, as indicated by the occasions (some of which are described later in this opinion) when park officials did not hesitate to enforce laws aimed at Gerritsen's unprotected, disruptive conduct. Thus, a total ban on this activity in these areas is unjustified.

*Id.* at 577.

Importantly, the regulation in *Gerritsen* did not erect a complete ban on expression in the entire park; it only barred expression "in certain areas of the park (indicated by blue demarcations on the pavement)" that the government claimed were very crowded. 994 F.2d at 573. Indeed, the Ninth Circuit explicitly acknowledged that the challenged regulation allowed alternative avenues of communication because "Gerritsen could leaflet in other areas of the park…" under the regulation. *Id.* at 577. Practically, the regulation in *Gerritsen* created speech zones in the park where literature distribution was allowed and anti-speech zones in the park where literature distribution was prohibited.

Despite the existence of alternative avenues for communication within the park, the Ninth Circuit still invalidated the regulation for insufficient tailoring because it banned activities (literature distribution) that did not threaten the "calm, secure environment" or create "congestion in these often crowded areas." *Id.* at 577. *Gerritsen* is directly on point, for just like here, the government broadly banned expression in some areas of a traditional public forum that

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-17
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

did not threaten the government's alleged interests. *See also Saieg,* 641 F.3d at 732 (invalidating ban on literature distribution in festival despite ability of persons to distribute literature from a booth located "in the central area" of the festival); *Kuba*, 387 F.3d at 859-62 (invalidating regulation that limited expression, except conversation, to particular zones in traditional public fora); *ACLU of Nevada*, 333 F.3d at 1106 (rejecting congestion rational as justification for banning literature distribution in particular city sidewalk even though literature distribution allowed on nearby sidewalks); *Lederman*, 291 F.3d at 39-40 (invalidating ban on literature distribution in no-demonstration zone on sidewalk on Capitol grounds even though expression was allowed in nearby lawn area on Capitol grounds); *Roberts v. Haragan*, 346 F.Supp.2d 853, 869-70 (N.D.Tex. 2004) (invalidating university regulation for lack of tailoring because it limited students' expression outside of free speech zones).

Issaquah's ban should be invalidated for the same reasons: the ban is not narrowly tailored to serve any significant government interest.

## II.     ASCHERL IS SUFFERING IRREPARABLE HARM

Without the requested injunction, Ascherl is continually prevented from exercising his First Amendment rights in a traditional public forum. Ascherl desires to distribute literature at the upcoming 2011 Salmon Days Festival and all future Festivals but the fear of punishment prevents him from doing so. The loss of his constitutional right to speak is both actual and imminent, and such loss results in irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). *See also Sammartano v. First Judicial District Court,* 303 F.3d 959, 973 (9th Cir. 2002) ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-18
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

demonstrating the existence of a colorable First Amendment claim.") (quotation marks and citation omitted).

## III.   INJUNCTION WILL CAUSE NO HARM TO DEFENDANTS

Granting Ascherl's request for injunctive relief will cause no harm to Defendants. They have no legitimate interest in enforcing an unconstitutional policy. *See, e.g., Newsom ex rel. Newsom v. Albemarle County School Bd.,* 354 F.3d 249, 261 (4th Cir. 2003) (noting that defendants are "in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional.").

## IV.   PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF

In this matter, the public interest will not be served by the continued discrimination against Ascherl's speech. Rather, the public is best served by preserving public discourse. *See Sammartano*, 303 F.3d at 974 ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests this Court to grant his Motion for Preliminary Injunction.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-19
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088

Respectfully submitted this 5th day of August, 2011.

By:   s/Nathan M. Manni
Nathan M. Manni
WSBN 35373
Cohen, Manni, Theune & Manni, LLP
520 E Whidbey Ave., Suite 201
P.O. Box 889
Oak Harbor, WA 98277
Ph. 360-675-9088   Fax: 360-679-6599
amanda@cmtlaw.net
Attorney for Plaintiffs

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION-20
(Case No. -------)

Cohen, Manni, Theune & Manni LLP
P.O. Box 889
Oak Harbor, WA  98277
Tel. 360-675-9088